GARGOYLES, INC. and Pro–
Tec, Inc., Plaintiffs,

v.

UNITED STATES, Defendant.

No. 342–88C

United States Court of Federal Claims.

Jan. 2, 1997.

96

Paul T. Meikeljohn, Seattle, WA, for plaintiffs.

Gary L. Hausken, Civil Division, Department of Justice, Washington, D.C., with whom was Frank W. Hunger, Assistant Attorney General, Vito J. DiPietro, Director, and Janice M. Mueller, for defendant.

REDACTED VERSION[1]

## OPINION

MARGOLIS, Judge.

This case is before the court for a determination of damages after a trial on damages as a result of defendant's infringement of plaintiffs' patent. Plaintiffs sought lost profits for defendant's actions, or in the alternative, a reasonable royalty of 50% of the government's procurement savings. Defendant argued that plaintiffs were entitled to a reasonable royalty of 3.25%–5% of the cost of the infringing eyewear. After a careful review of the evidence presented and the relevant case law, the court finds that plaintiffs are entitled to a 10% reasonable royalty.

## FACTS

This case has been before this court for many years with three opinions having already been entered. All relevant facts as to liability can be found in those three opinions. In 1992 a trial on liability was held, and this court found that the Army had not infringed plaintiffs' patent, U.S. Patent No. 4,741,611 ("'611 patent"). *Gargoyles, Inc. v. United States,* 26 Cl.Ct. 1367 (1992). The Federal Circuit affirmed the court's finding of noninfringement of the design patent and of no literal infringement of claims 2 and 8, but remanded for reconsideration of literal infringement as to claim 1 and for an examination of the doctrine of equivalents as to claims 1, 2 and 8. *Gargoyles, Inc. v. United States,* 6 F.3d 787 (Fed.Cir.1993). On remand, this court found that the Army's acquisition of the Ballistic Laser Protective System ("B/LPS") did infringe claims 1 and 8 of the '611 patent. *Gargoyles, Inc. v. United States,* 32 Fed.Cl. 157 (1994). As a result, a trial on damages was held for three days in Washington DC.

The only device found to have infringed plaintiffs' '611 patent, and therefore the only device at issue in this litigation is the B/LPS, manufactured for the United States Army by American Optical ("AO"). It was spawned, at least in part, by the work of Colonel Francis LaPiana, an Army optometrist who,

1. This is the redacted version of the opinion issued on December 18, 1995, which remains under seal. Deletions of confidential information are indicated by ellipses within brackets.

as early as the 1960's advocated the development of protective eyewear for soldiers. In 1971, Col. LaPiana discussed his desire for military eye protection with AO; however, AO informed him that the type of protection he sought (ballistically resilient with full orbital cover while being attractive enough for soldiers to wear even when off duty), though technically feasible, was uneconomical.

By 1981, Col. LaPiana learned of Gargoyles fashion eyewear. Gargoyles' claims as to ballistic protection with substantial wrap depth, while maintaining an attractive appearance, led Col. LaPiana to talk with Dennis Burns, founder, chief executive officer, president and principal stockholder of both Pro–Tec and Gargoyles, Inc.

In October of 1981, Col. LaPiana wrote Burns, indicating it was his belief that the "first step" had been taken towards the development of "eye armor." Letter from Francis LaPiana, Col., United States Army, to Dennis Burns, President, Pro–Tec, Inc. (October 1, 1981). By the time of this letter, a joint services working group had been formed to aid in the development of eye armor suitable for all servicemen in the United States military. Col. LaPiana has been a member of the joint working group since its inception.

From 1981 to 1986, Burns made several presentations to the Army about Gargoyles eyewear and his belief that it corresponded favorably to their need for protection and attractiveness. Burns and Col. LaPiana also corresponded on a number of occasions about the Army's requirements and desires during that time frame, and Col. LaPiana provided Burns with the results of Army tests on Gargoyles.

One of these tests, referred to as the Pickle Meadow Test, showed that troop acceptance of Gargoyles eyewear was high. However, the commercial Gargoyles had unacceptably high levels of breakage. In addition, commercial Gargoyles could not be worn by soldiers requiring prescription eyewear. Gargoyles also failed to meet American National Standards Institute standard Z87.1–1979, which required a lens thickness of at least 3mm for all safety glasses.[2]

The Army performed extensive testing of Gargoyles from 1981 to 1986. While Gargoyles were considered attractive, they were deemed insufficiently durable for Army use, had too much optical distortion, and fit poorly with insufficient areal coverage on large males.

While the Army was testing Gargoyles, it was also developing its own ballistic eyewear for soldiers. Initially, development was divided between the U.S. Army Natick Research Development and Engineering Center ("Natick") and the Medical Research and Development Command ("MRDC"). Natick, which develops personal equipment for the soldier generally, was responsible for the development of non-prescription protective eyewear, while MRDC, which is responsible for the development of medical devices, was developing prescription protective eyewear for soldiers. The Natick program was called Ballistic Eye Protection, Emmetrope[3] ("BEPE"), while MRDC was developing Integrated Field Eyewear System ("IFES"), which was protective eyewear with a prescription lens insert.

As part of Natick's procurement of the BEPE, Col. LaPiana prepared a draft of the technical specifications to be included in the BEPE Request for Proposals ("RFP"). This draft required the eyewear to have a "toric wrap lens so as to be attractive by avoiding the 'bug eye look' produced by spherical lenses of wrap depth." Plaintiff's Exhibit 168. Melvin Jee, who was ultimately responsible for the technical specifications of the BEPE RFP, deleted the requirements that the BEPE have toric lenses and be attractive in appearance. In response, Col. LaPiana

---

**2.** While Burns conceded that Gargoyles did not meet this required thickness, he explained this deficiency by noting that "the specification[ ] was written for safety glass prior to the successful application of polycarbonate to optical products, and it is now under review for the purpose of reducing the thickness requirement because of the advent of polycarbonate optical products."

Letter from Dennis Burns, President of Gargoyles, Inc., to Col. A.D. Rogers, III, United States Army (Nov. 12, 1986).

**3.** An emmetrope is an individual who does not need corrective prescription eyeglasses.

wrote two letters to Lt. Gen. Moore, Deputy Commanding General, Research, Development and Acquisition, HQ, DARCOM, in Virginia, to express his displeasure with the final BEPE RFP's technical specifications.

At approximately the same time as Natick's issuance of the BEPE RFP, MRDC issued a RFP for IFES. The IFES RFP's technical specifications required the eyewear to have toric lenses and an attractive appearance.

Gargoyles did not submit a proposal in response to the BEPE RFP. The Army ultimately awarded the BEPE contract, Contract No. DAAK60–85–C–0032 (" '0032 contract"), to American Optical on November 19, 1984. All eyewear procured pursuant to the '0032 contract was received by the Army prior to the issuance of the '611 patent, and thus is not involved in this litigation. Gargoyles did, however, submit a proposal in response to the IFES RFP.

On September 11, 1984, U.S. Army contract specialist Danny Laspe wrote Gargoyles concerning its response to the IFES RFP. Laspe informed Gargoyles that its costs were considered too high and that the government needed a complete Technical and Data Package with unlimited rights in that technical data. In response to this letter, plaintiff withdrew its proposal on September 27, 1984, stating "that performance of the tasks of the proposed R & D contract would be impossible for Gargoyles, Inc. at this time, concurrent with other commitments already made." Letter from Dennis Burns, President of Gargoyles, Inc., to Danny Laspe, Contract Specialist, United States Army (Sept. 27, 1984).

The Army awarded two contracts as a result of the IFES RFP. The first, awarded to Gentex, Inc., is not at issue in this litigation. The second, Contract No. DAMD17–85–C–5073 (" '5073 contract"), was awarded to AO on December 31, 1984. Of the units procured under the '5073 contract, only 50 pairs of eyewear were actually delivered after the issuance of the '611 patent.

The infringing eyewear at issue in this litigation, the B/LPS, was the end product of the Army's combination of the BEPE, IFES and a third program called Optical Protection Against Lasers. In 1985, MRDC issued an RFP relating to the procurement of the B/LPS and other related items. Of the two contracts which issued from that RFP, only one is at issue here. That contract, No. DAMD17–86–6079 (" '6079 contract"), was awarded to AO on January 21, 1986. Pursuant to the '6079 contract, AO delivered 443,-660 units to the government, 1,892 of which were delivered prior to the issuance of the '611 patent. Under a different contract, No. DAAK60–91–C–0127, an additional 664 units were procured by the Army. Another 516 units of eyewear were purchased at various times by the government through small purchase orders.

Simultaneous with its procurement of the B/LPS, the Army was in the process of developing a protective eyewear system that employed cylindrical lenses, known as SPECS. In 1987, UVEX Winter Optical Inc. was awarded Contract No. DAAK60–87–C–0041 to develop and produce SPECS. At that time Col. LaPiana was skeptical that cylindrical lenses could meet the needs of the Army as effectively as toric lenses. By 1989, however, this issue had been reopened. In fact, Col. LaPiana testified that by 1989 he would have omitted the requirement that the Army's protective eyewear have toric lenses. By 1992 or 1993, Col. LaPiana had the results of large scale testing in which emmetropic soldiers actually preferred the SPECS to the B/LPS. By this time, he was fully convinced that cylindrical eyewear was acceptable for the military's needs.

SPECS are designed only for emmetropes. The Army began testing the SPECS in 1990 and to date has purchased between 500–600 for that purpose. Harold Moody, the Natick engineer responsible for the development of SPECS, testified that SPECS currently meet all the Army's technical requirements. As a consequence, he has recommended to his superiors that they be type classified,[4] although

---

4. Once an item is type classified, it becomes part of the standard issue and can be given to all soldiers.

as of trial they had not been either type classified or otherwise fielded by the Army.

## DISCUSSION

Plaintiffs bring this case under 28 U.S.C. § 1498(a). This statute provides a plaintiff with the right to "reasonable and entire" compensation whenever the government directly infringes upon a plaintiff's rights as a patent holder. *Decca Ltd. v. United States,* 225 Ct.Cl. 326, 336, 640 F.2d 1156 (1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). Because the government may take a license in any United States patent, "[i]t is settled that recovery of reasonable compensation under § 1498 is premised on a theory of an eminent domain taking under the Fifth Amendment." *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 264, 552 F.2d 343, *modified,* 213 Ct.Cl. 307, 557 F.2d 265 (1977), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). Thus, the same basic principles of fairness that govern just compensation for an eminent domain taking are applicable in determining reasonable and entire compensation under § 1498. *See Tektronix,* 213 Ct.Cl. at 264–65, 552 F.2d 343; *Penda Corp. v. United States,* 29 Fed.Cl. 533, 573 (1993), *appeal dismissed,* 44 F.3d 967 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1962, 131 L.Ed.2d 853 (1995). This concept applies with equal force to both plaintiff and the government, for it is as much "a fundamental component of fairness to avoid excessive compensation to the condemnee as it is to be sure not to pay him too little." *Tektronix,* 213 Ct.Cl. at 272, 552 F.2d 343.

Plaintiffs claim that their lost profits constitute reasonable and entire compensation for the government's infringement. Defendant, however, asserts that such an award would be excessive, thereby granting plaintiffs a windfall. Instead, defendant urges the court to adopt a reasonable royalty as the correct method of assessing damages.

### I. Lost Profits

In a § 1498 action "a reasonable royalty for the license is the preferred method of valuation." *Decca,* 225 Ct.Cl. at 336, 640 F.2d 1156. *See also Penda,* 29 Fed.Cl. at 573 ("Courts most frequently determine reasonable and entire compensation by calculating a reasonable royalty."). For a plaintiff to get lost profits under § 1498 it must show, by the "strictest proof," that it would have actually earned and retained the sums claimed on its sales to the government. *Tektronix,* 213 Ct.Cl. at 267, 552 F.2d 343; *Penda,* 29 Fed.Cl. at 573. Plaintiffs must show by clear and convincing evidence that they would have actually supplied, and the government would have actually bought, all protective eyewear defendant did in fact buy from American Optical. *See Tektronix,* 213 Ct.Cl. at 267, 552 F.2d 343.

In order to recover lost profits generally, an aggrieved patent owner must prove:

(1) demand for the patented product,

(2) absence of acceptable noninfringing substitutes,

(3) his manufacturing and marketing capability to exploit demand, and

(4) the amount of the profit the patentee would have made.

*Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156 (6th Cir.1978) (Markey, C.J., sitting by designation). To recover lost profits, a plaintiff must also show that "but for" the defendant's infringement plaintiff would have made the infringer's sales. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1218 (Fed.Cir.1993). A failure to adequately prove any of the four *Panduit* factors precludes an award of lost profits. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d 1161, 1165 (Fed.Cir.1991). As the government contests plaintiffs' proof only as to factors two, three and four, they will each be addressed *seriatim.*

### a. Capacity

The parties dispute Gargoyles' capacity to meet defendant's demand for the protective eyewear it actually procured in the form of the infringing device. Gargoyles contends that it proved it could have met defendant's demand by demonstrating it had the capacity to assemble, mold and obtain sufficient quantities of components (such as nosepieces, temples, hinges, arms, etc.) dur-

ing the relevant accounting period. Dennis Burns testified that meeting increased assembly needs was merely a matter of hiring a few more people and adding a few more tables in the assembly area. Apparently minimal training is required.

[ . . . . ]

The government rebutted Burns' testimony through the testimony of its accounting and financing expert, Dr. Abram Hoffman, a partner in the accounting firm of Price Waterhouse. Dr. Hoffman testified that capacity has two separate components, a manufacturing aspect and a financial aspect. In his opinion, plaintiff failed to prove its ability to satisfy either prong of the test.

As to manufacturing capability, in 1991 alone Gargoyles would have had to more than [ . . . ] its manufacturing output because Operation Desert Storm caused a peak in the government's needs. Furthermore, manufacturing involves more than mere molding of the lenses. It also involves a lens coating, hinges, temples, and assembly of the glasses. [ . . . . ] Dr. Hoffman noted that to [ . . . ] production to meet the government's 1991 demand, each of these companies would have had to coordinate in order to manufacture and deliver a final product in a timely manner. However, no testimony was offered as to how Gargoyles would have integrated the operations of these [ . . . ] other companies to successfully meet defendant's demand while maintaining quality control. Moreover, no testimony was offered as to whether these other companies had either the capacity (except for mold capacity) or the willingness to more than [ . . . ] their production to meet Gargoyles new found demand.

[ . . . . ]

The court finds that, based upon the credible testimony of Dr. Hoffman, the bare testimony of Burns does not demonstrate by the strictest proof that plaintiff in fact had either the manufacturing or financial capacity to meet the government's "but for" demand.

Having failed to prove its capacity by clear and convincing evidence, plaintiff may only recover a reasonable royalty. *See Smith-*

*Kline,* 926 F.2d at 1165. However, assuming *arguendo* that Gargoyles had met its burden as to capacity, it would still be forced to accept a reasonable royalty because of its failure to prove either the absence of an acceptable noninfringing alternative, or its quantification of lost profits.

### b. Absence of acceptable noninfringing alternatives

In this stage of its analysis, the court must hypothesize a world in which the infringing B/LPS did not exist. It is plaintiffs' burden to prove by the strictest proof that the government would have met its need for a protective spectacle by buying Gargoyles as opposed to another, noninfringing eyepiece. Here the government asserts that SPECS were an acceptable noninfringing alternative to Gargoyles.[5] Thus, plaintiffs must show by clear and convincing evidence that in a non B/LPS world, SPECS would not have diverted sales of Gargoyles to the Army. *See Tektronix,* 213 Ct.Cl. at 267, 552 F.2d 343; *Panduit,* 575 F.2d at 1162.

Plaintiffs argue that SPECS were not an acceptable noninfringing alternative to Gargoyles for two reasons. First, Gargoyles asserts that toricity was an important feature for the Army during the relevant time period. If this is so, then SPECS are not an acceptable noninfringing alternative since SPECS have cylindrical, rather than toric lenses.

In support of this position, plaintiffs point to the IFES RFP issued by MRDC. It required that any responding company provide protective eyewear that had toric lenses with substantial wrap depth and zero power. The draft BEPE RFP issued by Natick contained these same requirements, and when the final RFP was issued without some of them, Col. LaPiana criticized the RFP. Similarly, during Desert Storm, the Army's technical requirements for protective eyewear made clear that the eyewear must be a toric wrap so as to meet its "Comfort and Attractiveness" requirements.

---

5. Because SPECS have cylindrical as opposed to toric lenses they are clearly noninfringing. Thus, the sole issue is whether SPECS were an "acceptable" substitute during the relevant period.

This argument is unavailing for plaintiffs. First, plaintiffs seem to argue that only toric lenses are acceptable to the Army, and thus there are no other products that can serve as an acceptable noninfringing substitute. However, the question is, are SPECS acceptable to the Army despite their lack of the patented feature in question, *i.e.*, toric lenses with substantial wrap depth and zero power. The answer to this question is yes. SPECS are clearly acceptable to the Army both in terms of performance and appearance, despite their cylindrical lenses. In support, Harold Moody from Natick testified that SPECS met all of the Army's technical qualifications for eye armor, that he recommended type classification, and that SPECS's had high troop acceptance.

Furthermore, Col. LaPiana, who drafted the toric wrap requirements included in both MRDC's final RFP and Natick's draft RFP, testified at trial that by 1989, he was no longer certain that toric lenses were the only lenses that could satisfy the Army's needs and that, if he were to draft those requirements in 1989, he would no longer have included a toric lens requirement. In fact, by 1992 or 1993, Col. LaPiana testified that he had been fully converted to the view that cylindrical lenses were satisfactory for the Army's use. Therefore, based upon all the evidence before it, the court finds that SPECS were acceptable for the Army's needs.

Plaintiffs next contend that the SPECS were not fully developed, and thus were not available for fielding by the Army, during the relevant time period. Plaintiffs note that during Desert Storm the B/LPS was type classified "Urgent" by the Army, while as of the time of trial SPECS had still not been type classified.

While it is true that SPECS were not in full scale operation during the relevant time period, work on the development of the SPECS began a year before the '611 patent issued. Testing of the product began in 1990. Significantly, by the time of Operation Desert Storm only human improvements, such as an adjustable nose piece, were left to be implemented, while at the same time the Gargoyles eyewear were not at zero power,

had problems with full areal coverage, and were a poor fit on large males. These two factors, when taken together, are critical, for they demonstrate that in a non B/LPS world, the Army was in fact no more likely to procure Gargoyles than to expedite the development and procurement of the noninfringing SPECS. Thus, plaintiffs have not shown by clear and convincing evidence that they actually lost sales due to the infringing product. The SPECS are an acceptable noninfringing alternative to the Gargoyles eyewear.

*c. Quantification of lost profits*

In addition to their failure to prove capacity and lack of acceptable substitutes, plaintiffs have also failed to quantify their alleged lost profits.

Plaintiffs' lost profits analysis was performed by plaintiffs' accounting expert, Mark Peterson, the founder of Robinwood Consulting. He began his analysis with the price Sunglass Hut negotiated for the purchase of Gargoyles eyewear. Sunglass Hut is the world's largest retailer of sunglasses. [ . . . . ] The government, however, is unwilling to provide such minimums, nor would they promote the product. Therefore, Peterson added a two-dollar premium to the Sunglass Hut price to obtain the price at which Burns would have been willing to sell eyewear to defendant. From this military premium price, Peterson subtracted the expenses associated with the manufacture of the eyewear, resulting in Gargoyles' gross profit per unit of eyewear. He then multiplied this number by the total number of B/LPS's procured by the Army, the product of which was Gargoyles' lost profits. Peterson also performed the same computation using the lower, Sunglass Hut price as the military price.

Peterson justified his analysis by delving into the procurement cost savings and medical benefits the government derived from the taking of plaintiffs' technology. With respect to procurement savings, he took the American Optical bid price of $8.70, compared it to the Sunglass Hut price and found that the government saved [ . . . ] unit by not buying from Gargoyles. He also compared the AO price to the prices individual units of the

government, such as the Special Forces, were willing to pay off the GSA schedule for small scale purchases. This resulted in a procurement savings of [ . . . ].

As to the medical benefits that using Gargoyles would have conferred to the Army, Peterson calculated that if Gargoyles prevented only 10% of all preventable military eye injuries the government would have saved between $47 and $360 million simply by using the product.

Dr. Hoffman, the government's lost profits analyst, reverse engineered a hypothetical price for the military Gargoyles by using costs and expected margins. He looked at what Gargoyles' expectations were as to both the pricing and profitability of the military eyewear based upon their business plan and Peterson's calculations. First, based on its business plan, Gargoyles expected a [ . . . ] gross margin on its military product, as opposed to the [ . . . ] gross margin it earns on the commercial eyewear. In addition, Peterson's calculations show that to produce the military product costs [ . . . ] of its commercial counterpart. These facts, when combined with the actual costs of the commercial eyewear, gives a production cost of [ . . . ] per unit for the military eyewear. However, this represents only [ . . . ] of the total price of the military product, leaving the other [ . . . ] as the expected gross margin. This left Gargoyles with an incremental gross profit of [ . . . ] per unit. Dr. Hoffman then extended his analysis to show that after additional, non-production expenses, such as general administrative expenses and the cost of capital are taken into account, Gargoyles incremental profit reduces to only [ . . . ] per unit on the military Gargoyles product.

Dr. Hoffman also noted a number of areas where, in his view, Peterson's analysis was flawed. The first was plaintiffs' view that the military price would be equal to or higher than the commercial product. Gargoyles' business plan shows that it valued defendant as a very large potential customer with great commercial endorsement value. Further-

more, Burns testified that foreign governments were interested in procuring Gargoyles for their militaries, but that when the Army procured the B/LPS, this interest evaporated. These reasons suggest that Gargoyles valued the possibility of having the government as a customer and consequently would have negotiated a lower unit price than the [ . . . ] price.

Second, Peterson's use of the $8.70 AO price as the base number for his procurement savings was flawed. That was the lowest price at which the Army ever procured the B/LPS. However, the Army also procured the B/LPS for amounts substantially in excess of $8.70. In fact, the average price the Army paid for the B/LPS was $12.74. Thus, when the artificially low AO price is compared against the artificially high Gargoyles price, the resulting procurement savings of [ . . . ] is well in excess of the [ . . . ] procurement savings Dr. Hoffman calculated by comparing the average B/LPS price to the hypothetical military Gargoyles price.[6]

[ . . . . ]

Fourth, while Peterson thoroughly analyzed Gargoyles' expenses to demonstrate that they were either fixed or unassociated with the government contract, according to Dr. Hoffman, he neglected to do the reverse. Peterson failed to look for costs that would be incurred by satisfying the government's demand that are not incurred when meeting normal commercial demand. Dr. Hoffman found evidence of these costs in Peterson's own notes. For example, although the government contract would not require selling expenses, it would require a dedicated officer for contract administration, along with associated travel and entertainment expenses. Dr. Hoffman testified that such an expense was omitted from Peterson's analysis. Peterson also omitted the additional production costs associated with exceeding the capacity of a second shift for assembly and demand for subcontractor parts. As Dr. Hoffman noted, "[t]here's no provision in Mr. Peter-

---

6. Peterson also compared the $8.70 AO price to the GSA schedule price for Gargoyles of $33.62 in order to quantify defendant's procurement savings. This comparison is particularly unhelpful because only 10,000—15,000 units were purchased at this price, often in purchases of one or two pairs of glasses. Dr. Hoffman testified that such small purchases would not merit a volume discount, unlike a purchase in excess of 400,000 units.

son's calculation for an overtime premium or a shift differential for that second shift or for additional costs that might be associated with the subcontractors."

Dr. Hoffman also criticized Peterson's use of medical cost savings in his lost profits analysis. Specifically he objected to Peterson's comparison between the use of eye armor versus an unprotected eye in demonstrating the medical benefits the government would have received in using the Gargoyles. Instead, the proper comparison would have been to examine the eye-saving advantages of using Gargoyles over the next best available alternative. That comparison accurately measures the medical benefits that using Gargoyles confers on the government.

Last, Peterson failed to apportion his damages between Gargoyles and Pro–Tec. The record ownership of the patent shows that Pro–Tec owned the patent from the date of its issuance on May 3, 1988, to the date of its assignment to Gargoyles on November 9, 1988. As a result, the damages should be apportioned between those parties to accurately reflect their period of ownership. Dr. Hoffman did so, while Peterson did not.

Dr. Hoffman's testimony was credible and well reasoned, particularly his lost profits analysis. Therefore, based on the foregoing discussion, the court finds that plaintiff has failed to carry its burden of quantifying its lost profits by clear and convincing evidence.

## II. Reasonable Royalty

When first determining a reasonable royalty the court looks to see if there is an established royalty applicable to the patent at issue. If so, then that rate will usually be adopted as the best measure of reasonable and entire compensation. See Calhoun v. United States, 197 Ct.Cl. 41, 55–56, 453 F.2d 1385 (1972). On the other hand, "[i]f there is no established royalty, the rate will typically be determined through a process of hypothetical negotiation between a suppositious 'willing buyer' and 'willing seller' as of the date of initial infringement but using knowledge of events which occurred after the initial infringement and which, thus, could not have been known by actual negotiators as of

that date." Hughes Aircraft Co. v. United States, 31 Fed.Cl. 481, 484 (1994).

In the present case, there is no established royalty rate for the '611 patent. Plaintiffs in fact have never licensed this technology. The court must therefore fashion a reasonable royalty using the hypothetical negotiation model of a willing buyer and a willing seller. A comprehensive list of fifteen factors is set forth in Georgia–Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), modified and affirmed, 446 F.2d 295 (2d Cir.), cert. denied, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). These factors assist the court in approximating a reasonable royalty by elucidating those considerations which would have influenced reasonable businessmen resolved to enter a mutually acceptable licensing agreement.

Before engaging in the hypothetical negotiation, the court makes two observations. First, not all Georgia–Pacific factors are relevant to any particular hypothetical negotiation. As will be seen, this case is no exception. Second, and perhaps more importantly, it is critical to keep in mind throughout this analysis that "[t]he whole notion of a reasonable royalty is a device in the aid of justice, by which that which is really incalculable shall be approximated." Cincinnati Car Co. v. New York Rapid Transit Corp., 66 F.2d 592, 595 (2d Cir.1933) (per L. Hand, J.).

In determining a hypothetical reasonable royalty, there are two elements that must be determined—the royalty rate and the royalty base. It is axiomatic that a royalty rate can only have meaning when viewed relative to the base to which it is applied. Hughes, 31 Fed.Cl. at 485. Generally speaking, the royalty rate and royalty base have an inverse relationship, so that when the base goes down the rate goes up, and vice versa. Bendix Corp. v. United States, 230 Ct.Cl. 247, 258, 676 F.2d 606 (1982).

### a. Royalty base

In determining the appropriate base to which the royalty rate is applied, the first issue is whether the laser lens outsert should be included in the royalty base of the '6079

contract.[7] Defendant asserts that it should not. In support of this position, defendant points to the testimony of its licensing expert, Paul Wylie. Wylie testified that the laser outserts should be excluded from the compensation base because they were a separate item, unlike the retaining strap, case and cleaning kit, all of which were included in the price of the eyewear kits procured by the Army. In addition, plaintiffs have never made these laser outserts and offered no evidence that they could have done so.

Plaintiffs seek to include the laser outserts in the compensation base by the application of the "entire market value rule." The rule allows, in certain instances, for the inclusion of unpatented items in the royalty base. "The directive applies only if the invention has substantially created the value of the items, *i.e.*, the sole utility of the items consists in their being used in combination with the invention." *Decca*, 225 Ct.Cl. at 349, 640 F.2d 1156. *See also ITT Corp. v. United States*, 17 Cl.Ct. 199, 213 (1989) ("An unpatented item . . . must have some functional relationship to the patented . . . item other than being sold in conjunction with an includable unpatented item . . . that incorporates the patented item. The connection cannot be too attenuated. It is insufficient nexus to expect inclusion of a product that is related only to the integral unpatented item, but has no functional relationship to the patented item.").

Here, while a laser shield has a function outside the context of the patented device, the laser outsert cannot be used except in conjunction with the protective eyewear. The laser outsert is molded, fashioned and designed to be worn over the protective eyewear. It is a part of every protective eyewear kit procured by the government and is not sold as a separate or optional item of the kit; *i.e.*, it has *no independent existence* outside of its inclusion in the protective eyewear kit. Thus, because the "utility of the [laser outserts] consists in their being used in combination with the [protective eyewear]," the court finds the entire market value rule applicable, and therefore includes the laser outserts in the compensation base. *See Decca*, 225 Ct.Cl. at 349, 640 F.2d 1156.

Defendant next addresses the Cost Plus Fixed Fee ("CPFF") portion of the '6079 contract. This represents the development phase of the contract. Wylie opined that these units were analogous to test samples or promotional items and thus deserved no compensation. As defendant admits, however, such a position is disfavored by this court. *See deGraffenried v. United States*, 25 Cl.Ct. 209, 212 (1992) (defendant's *de minimis* use of plaintiff's patent still requires just compensation).

As an alternative, Wylie suggested that reasonable compensation for Gargoyles might be 50% of the profit portion of the CPFF contract. The court is inclined to agree. Therefore, plaintiff shall receive 50% of the profit from the CPFF portion of the '6079 contract.

The final issue is the actual number of units procured during the relevant time frame. After some initial confusion, both parties now agree that after the issuance of the patent, the Army procured a total of 442,357 units. Dr. Hoffman testified that 19,346 of these units were procured while Pro–Tec owned the patent.

b. Royalty rate

■ *Georgia–Pacific* is the guidepost used by federal courts to engage in a hypothetical negotiation.[8] While *Georgia–Pacific*

7. Defendant concedes that items such as the retaining strap, case and cleaning kit should be included in the royalty base.

8. The fifteen *Georgia–Pacific* factors are:
  1) The royalties received by the patentee for licensing of the patent in suit, proving or tending to prove an established royalty.
  2) The rates paid by the licensee for the use of other patents comparable to the patent in suit.
  3) The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
  4) The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
  5) The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line

involved an action between two private litigants, it has since been adopted for use in § 1498 actions. *See, e.g., Tektronix,* 213 Ct. Cl. 257, 552 F.2d 343; *Penda,* 29 Fed.Cl. 533; *Decca,* 225 Ct.Cl. 326, 640 F.2d 1156; *Hughes,* 31 Fed.Cl. 481. There was testimony by both Wylie and Peterson concerning the importance of some of these factors in determining a reasonable royalty. Each witness came to dramatically different conclusions.

The first relevant factor is factor three, the nature and scope of the license. Generally, a non-exclusive license commands a lower royalty rate than would an exclusive license. *Hughes,* 31 Fed.Cl. at 489; *Penda,* 29 Fed. Cl. at 576. Here, the license taken by the government is a non-exclusive license as a matter of law. *Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir.1984). This factor would tend to militate in favor of a lower royalty rate.

The next relevant factor is factor four relating to the licensor's established licensing policy. The parties disagree about Gargoyles' willingness to license the '611 patent, for a patentee's reluctance to license its patent is relevant in determining reasonable and entire compensation for a government taking. *See Leesona Corp. v. United States,* 599 F.2d 958, 976 (Ct.Cl.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *Penda,* 29 Fed.Cl. at 578.

Defendant places great weight on a letter sent by Burns to the Army in February of 1986 responding to a January 1986 request that Gargoyles sell the Army a "technical data package." Burns stated that "under appropriate circumstances we would be amenable to negotiation of the sale of a technical data package, or a similar contractual vehicle, that would permit competitive procurement of our products." Letter from Dennis Burns, President of Gargoyles, to Robert Smith, Natick Research and Development Center (Feb. 19, 1986). Wylie interpreted this language to mean that plaintiff was willing to license its patent to the government and thereby enter the military market without manufacturing risk.

Such an interpretation directly contradicts Burns' credible testimony, in which he stated that Gargoyles was never willing to license the '611 patent because it is "the core and heart" of the company; "it's what we are about." Tr. 93 at 16–21. Burns' testimony is reinforced by the fact that Gargoyles has never licensed the '611 patent.

The view that Gargoyles would have attempted to manufacture the eyewear itself, rather than license its technology, is not affected by the language the government quotes. The letter seems to be the opening salvo in an attempt to keep the government, potentially a very large customer, interested

of business; or whether they are inventor and promoter.

6) The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7) The duration of the patent and the term of the license.

8) The established profitability of the product made under the patent; its commercial success; and its current popularity.

9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11) The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12) The portion of the profit or of the selling price that may be customary in the particular business or comparable businesses to allow for the use of the invention or analogous inventions.

13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14) The opinion testimony of qualified experts.

15) The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. *Georgia–Pacific,* 318 F.Supp. at 1120.

in ultimately procuring Gargoyles. The "contractual vehicle" alluded to could be an offer to license the '611 technology. However, it could just as easily be an offer for a long-term, cut-rate contract for large Army orders not requiring a minimum number of purchases over the life of the agreement. Such an interpretation would surely accommodate both the government's need to procure eye armor at competitive prices without being tied to a sole source supplier and Gargoyles' desire that any such procurement be of its products.

Therefore, the court finds that, based upon credible testimony of Burns, the nonexistent licensing history of Gargoyles, and the ambiguous nature of the February 1986 Burns letter, plaintiffs were at all times unwilling to license the '611 patent.

Factor five, the commercial relationship between the parties, was addressed by Wylie during his testimony. He noted that the Army and Gargoyles were not competitors, but rather were more akin to a manufacturer and a very large customer. In view of this relationship, Wylie surmised that the government would have had the leverage to extract large discounts on its purchases, an observation supported by both the testimony of Peterson and a letter sent to the Army by Steven Hyjek, a lobbyist working on behalf of Gargoyles. In this letter, substantial discounts were promised on large scale Army purchases of Gargoyles.

While Wylie's observation is correct, "it is sometimes more appropriate to consider the hypothetical licensee to be the manufacturer of the product, rather than the government." *Penda*, 29 Fed.Cl. at 575. *See also Tektronix*, 552 F.2d at 349 (willing buyer of the license is considered to be the party that will manufacture the item). This is just such a case, for "[t]he commercial relationship between the patent owner and the manufacturer of the infringing article is likely to be more instructive as to the amount of a reasonable royalty than is the relationship between the patent owner and the government." *See Penda*, 29 Fed.Cl. at 579.

Here Gargoyles and American Optical are both manufacturers in the eyewear market. By procuring the B/LPS, the government has

essentially set up AO as a direct competitor with Gargoyles. Furthermore, in so doing the government has covered AO's costs of developing and manufacturing tooling for its product, has given AO valuable experience manufacturing the product on a large scale, has challenged the validity of the '611 patent, and has placed AO in an excellent position from which to directly challenge Gargoyles once the '611 patent expires. This overall negative change in competitive position "is part of what plaintiff has lost, and should be considered in determining its compensation." *Id.*

Therefore, although the government could expect to receive a lower royalty because it was a potentially large customer, this is more than offset by the fact that the government has set up AO as a viable competitor with Gargoyles. This factor favors a higher royalty rate.

The next factor of significance is factor eight, the established profitability, commercial success and popularity of the patented product. Obviously, the more successful a patented product, the higher the royalty rate. Wylie testified that, based upon his review of the relevant documents, Gargoyles profits were unremarkable, earning just below [ ... ] in the most profitable year reviewed. Furthermore, while conceding that Gargoyles has had, and continues to have commercial success, he also noted that [ ... ]. Last, he testified that, having reviewed AO's government contracts to produce the B/LPS, AO expected to make an 8–15% profit on the B/LPS.

Plaintiffs point to the testimony of Peterson in support of their contention that Gargoyles are highly profitable. In addition, plaintiffs note that Dr. Hoffman, during his direct examination, agreed that Gargoyles earns a [ ... ] gross profit on the sales of its commercial eyewear.

This factor is significant in determining the value a reasonable licensor would have put on the patent. "The license is valued from the perspective of the licensor." *Penda*, 29 Fed.Cl. at 580. *See also Leesona*, 599 F.2d at 977. This court has previously found the Gargoyles eyewear to be a commercial suc-

cess. *See Gargoyles,* 32 Fed.Cl. at 165. Furthermore, as the '611 patent is the very basis upon which Gargoyles exists as a corporate entity, it obviously is valued very highly by plaintiff, as Burns so testified. [ . . . . ]

Factor eleven, the licensee's use of the invention and the value of that use, was the next factor addressed by the parties. The parties differ as to the significance this factor should have on this court's analysis. Peterson testified that the government saved between $47 and $360 million in medical costs due to the eyewear's prevention of injuries. Peterson arrived at these figures by looking at the Army's testing of the Gargoyles eyewear in 1986, during which time 37 eye injuries were prevented. From these numbers he extrapolated that the Army annually suffers 321 eye injuries for every 6,500 soldiers. He then estimated the total cost to the Army of each eye injury and then multiplied the annual eye injuries incurred by the cost of those injuries. Then he took 10% of that product as an estimate of the total number of eye injuries that using Gargoyles could have prevented.

While Peterson's medical cost savings to the government is of theoretical interest, its practical application to the court's analysis is limited at best. The problem with his testimony is that the numbers he relied upon are based on mere supposition and speculation. Col. LaPiana could confirm neither the range of eye injury costs that Peterson used in his analysis, nor the number of eye injuries annually suffered by soldiers, stating that his own personal estimates in this regard were extremely "rough." Furthermore, Wylie testified that Peterson's analysis, while "very interesting" was really "just speculation at this point." Tr. 572 at 13–19. The court agrees with this observation. Peterson's calculations have "certainty only in the mathematical sense. . . . Collectively, there are simply too many points at which the hard figures introduced into [Peterson's] calculations are in fact only estimates." *Penda,* 29 Fed.Cl. at 582.

There is an additional defect with Peterson's calculation of medical savings in that these savings are based on a comparison between the use of Gargoyles on the one hand and no protective eyewear on the other. However, as pointed out by Dr. Hoffman, the proper comparison is to see how many eyes would have been saved by using Gargoyles instead of the next best available alternative. There is nothing in the record, however, making such a comparison. Peterson's comparison simply failed to recognize that the use of other eyewear would also produce a medical cost savings.

Therefore, based on the foregoing discussion, the court rejects Peterson's analysis as to the medical cost savings conferred on the government through the use of the Gargoyles.

[ . . . . ]

Petersen's second comparison was based upon the prices other government agencies have paid for Gargoyles when ordering small quantities directly off the GSA schedule. "These purchases demonstrate that Special Forces, other units and agencies of the government are regularly willing to pay an even higher rate than a volume purchase rate to acquire the benefits of the Gargoyles technology." *Id.* The difference between these purchases and the B/LPS procurement price was about [ . . . ] a unit.

Based upon these cost savings figures alone, rather than a thorough analysis of all the *Georgia–Pacific* factors, Peterson formulated his reasonable royalty rate. Peterson opined that half of the procurement savings represents a reasonable negotiated royalty. Such a position, however, is unsupported in law. While it is true that in doing a hypothetical negotiation, a court can look to procurement and other savings associated with the technology taken as evidence as to the amount a willing buyer would offer to a willing seller, such savings, in and of themselves, "are not used as a measure of compensation in preference to a reasonable royalty." *Penda,* 29 Fed.Cl. at 574. *See also Decca,* 225 Ct.Cl. at 345, 640 F.2d 1156.

The last factor of import is factor 12, the customary profitability and selling price of the patented technology. Wylie testified that Gargoyles profitability during the relevant accounting period was [ . . . ] of its selling price. He then considered licenses present-

ed by AO, as well as a series of licenses between Research Corporation Technologies and firms in the eyewear industry. Wylie then testified that licensing professionals use a rule of thumb in negotiating a license whereby the licensor gets between ⅓ and ¼ of the profits realized by the licensee. Applying that rule to this case, Wylie testified that a reasonable royalty rate would be between 3.75% and 5% of the B/LPS selling price. He based this percentage upon AO's estimated profits from the firm fixed price portion of the '6079 contract.

The court finds Wylie's reasoning unpersuasive and rejects his reasonable royalty calculation. First, the licenses which Wylie relied upon in determining industry licensing norms are of little weight. The licenses from Research Corporation Technologies were eleven sample licenses drawn at random from 56 license agreements involving the same two patents. Timothy Reckart, a Research Corporation Technologies employee called to authenticate the licenses, did not negotiate the licenses at issue, nor did he know the technology they encompassed. He acknowledged that one patent dealt with tempering soda glass and was in no way limited to eyewear use. Also, he did not know the size of many of the licensees.

William Cotter, general counsel of AO, authenticated the three licensing agreements presented by AO. None of those licenses dealt with eyeglasses. Two of the three licenses omitted the name of the licensor and the patent being licensed, thereby making it impossible to determine whether the leased technology was at the core of the licensor's business, or for that matter how important that business was to the licensor in the first place. The third license omitted the licensee and the patent number, thereby suffering from the same problems as the first two licenses.

None of these licenses assist the court because none are licenses of technology comparable to the Gargoyles technology. Furthermore, there was no showing of the importance of the technology involved in these licenses to either the licensor or the licensee. Wylie testified that every patent license must be evaluated based upon all the relevant facts. Because of the shortcomings outlined above, these licenses provide very little guidance in the determination of a reasonable royalty based on the unique facts of this case.

Of more concern to the court, however, is Wylie's overarching reliance upon his "rule of thumb." Much as Peterson seemed to ignore the totality of the circumstances associated with this hypothetical negotiation in determining his reasonable royalty, so too, it seems did Wylie. Having testified as to each *Georgia–Pacific* factor, minimizing any factors that favored a higher royalty and emphasizing those factors that did not, Wylie ignored the sum of his own testimony. Rather than balancing all the factors in an effort to "negotiate" a reasonable royalty, Wylie appears to have simply substituted his own "rule of thumb" as an adequate method of calculating a reasonable royalty. This, however, is not the charge of *Georgia–Pacific* and its progeny. "On the contrary, the determination of a reasonable royalty must be based upon the entirety of the evidence and the court is free to, indeed, must reject the royalty figures proffered by the litigants ... where the record as a whole leads the court to a different figure." *SmithKline,* 926 F.2d at 1168.

Thus, having rejected both Peterson's reasonable royalty of 50% of the government's procurement savings and Wylie's 3.25%–5% royalty rate, the court is forced to calculate its own reasonable royalty rate based upon the evidence presented as to the *Georgia–Pacific* factors discussed above. Such a predicament is not uncommon, for "the factual determination of a reasonable royalty ... need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party." *SmithKline,* 926 F.2d at 1167.

Therefore, having carefully reviewed all the evidence presented on the subject, the court finds that a reasonable royalty in this case is 10% of the royalty base outlined above. This determination is based in large measure on the unwillingness of Gargoyles to license their patent, the obvious value the patent holds in sustaining Gargoyles as a viable, profitable company, and the fact that the government's actions placed AO in a very

favorable position from which to compete more effectively with Gargoyles in the future. Furthermore, such an award is well within the royalty range previously given by this court to successful § 1498 plaintiffs. *See, e.g., Leesona,* 599 F.2d at 977 (10% reasonable royalty awarded); *Penda,* 29 Fed.Cl. at 586 (awarding a royalty of slightly less than 10% of infringing article's sales price).

## III. Delay Damages

■ The final issue before the court is the appropriate interest rate to be applied in the calculation of plaintiffs' delay damages. Delay damages are appropriate in § 1498 actions because such an award is part of just and entire compensation under a Fifth Amendment taking. *See Waite v. United States,* 282 U.S. 508, 509, 51 S.Ct. 227, 227, 75 L.Ed. 494 (1931). "The determination of the proper rate of interest or delay compensation is one of fact, and is exclusively a judicial function under the Constitution." *ITT,* 17 Cl.Ct. at 233 (citations omitted).

Plaintiffs argue that they should be compensated based upon the weighted average cost of capital ("WACC") because the WACC takes into account Gargoyles' specific and unique situation, including lost opportunity costs, as well as business, manufacturing and litigation risks. Thus, the WACC reflects the time value of money as it pertains specifically to Gargoyles during the relevant time frame.

■ The problem with the WACC is that "[t]here is a strong judicial policy in favor of uniform rates to apply to all those entitled to delay damages for a given period." *Hughes,* 31 Fed.Cl. at 492. In *Hughes,* the court refused to award plaintiff delay damages based upon its own unique return on equity, explaining that

> [a]doption of the plaintiff's proposal to award delay damages to it on the basis of its unique return on equity would result in obvious discrimination between it and other just-compensation claimants entitled to delay damages by reason of the govern-

ment's withholding of timely payment of principal over the same time periods. The anomaly is starkly illustrated by contemplating the result if the Williams patent had been owned half by the inventor Donald Williams and half by his employer, Hughes Aircraft Company. Under plaintiff's proposed method, the delay damages recoverable by the actual inventor for the identical withholding periods would be substantially less.

*Hughes,* 31 Fed.Cl. at 492 n. 12. The same difficulty besets an interest rate based on Gargoyles own unique WACC. Consequently, the court declines to adopt Gargoyles' WACC as the basis for delay compensation.

Alternatively, plaintiffs argue for Moody's Corporate Bond rate as the appropriate measure of delay damages. Moody's represents the composite time value of money for a number of corporations doing business in the United States. In essence, it is the rate at which a typical corporation would have had to borrow during the relevant time frame.

■ Defendant favors the 52–week Treasury Bills ("T–Bills") rate as the most appropriate rate for determining delay damages, arguing that plaintiffs are entitled only to a risk free market rate.[9] Plaintiffs have not undertaken any business risk in association with this award; litigation risk associated with the award is nonexistent because liability has already been determined; no collection risk exists because the government never defaults on adverse judgments; and market risk is inapplicable because delay damages are calculated based on a market that has already acted.

After careful consideration of the arguments presented by counsel, the court agrees with defendant's position and finds that the T–Bill rate is the proper method for determining delay damages in this case.

## CONCLUSION

For the reasons stated herein, the court rejects plaintiffs' request for lost profits. Plaintiffs shall receive a 10% royalty rate to

---

**9.** Treasury Bills are considered an accurate reflection of a risk free market loan. *See NRG Co.*

*v. United States,* 31 Fed.Cl. 659, 668 (1994).

be applied to the compensation base outlined above, except for the CPFF portion of the '6079 contract, from which plaintiffs shall receive 50% of the profits. Damages shall be divided between Gargoyles and Pro–Tec so as to accurately reflect the record ownership of the patent. Delay compensation shall be calculated using the one-year Treasury Bills rate for the relevant period. The parties shall calculate damages, and file a stipulation of judgment with the court by January 20, 1996.